IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CASE NO. <u>13CV1206 SMV-RHS</u>

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

14 MAR 25 PM 1:57

CLERK-ALBUQUERQUE

FRANK BLACKMOON, and
ZIOMARA IBARRA-BLACKMOON,

    Plaintiffs,

v.

ROBERT M. DOWNEY, P. A., and
ROBERT M. DOWNEY, an individual

    Defendants.
_____/

## DECLARATION OF FRANK BLACKMOON

I, FRANK BLACKMOON, being of full age, hereby declare under penalty of perjury and to the best of my knowledge state as follows:

1. I am a Plaintiff in the above captioned case.

2. I am a citizen of the U. S. A. and a full time resident of the State of New Mexico.

3. I am a co-inventor listed on U.S. Patent No. 6,337,618 B1 ("lock patent").

4. I submit this declaration in support of Plaintiffs' claims.

5. I am a client of the Florida based Robert M. Downey, P.A. law firm.

6. I have read the declaration of our patent attorney Robert M. Downey the President of Robert M. Downey, P.A., that being said, I conclude Mr. Downey perjured himself through his declaration.

7. For the record; when my wife and I became clients' of Robert M. Downey, P.A., in 1999 we <u>initially</u> made our payments to Downey only by personal check(s).

8. For the record; the types of financial documents bullet pointed below are in my possession. Admissible in a court of law, proof that certainly show Mr. Downey received payments from us for the legal service's his <u>business</u> provided:

   - personal checks; endorsed **FOR DEPOSIT ONLY**
   - personal checks; Mr. Downey personally **CASHED**
   - US postal money orders (cash equivalent) Mr. Downey **CASHED**; and
   - I allege; he received **CASH** money as payment on account.

9. Based on Mr. Downey's statement in his declaration in support of Defendants motion at paragraph (4) where Downey alleges as of March 11th 2002, that I, my wife Ziomara, and Mr. Craig failed to pay him $4,194.95, I decided to take it upon myself, to make a complete review of all of our documents and payments made to Downey from the beginning of our attorney-client relationship.

10. That being said, I completed my review of our records and have conclusive proof Downey's statement is not truthful. This statement by Downey is just one more of his misguided tactics, in his failed attempt to offset his liability as our attorney. Mr. Downey, a lawyer, has some answering to do.

11. I reviewed Downey's billings and each of our payments. I concluded Downey was paid in full. Moreover, when I looked more closely at all our canceled checks written to pay Downey's billings, the memo shows the CASFPA199,

which indicates the lock patent. The cancelled checks themselves indicate the funds were requested and paid to the bearer of the check.

12. However, in addition to me verifying payment, under closer scrutiny I noted the information on the back of the canceled checks revealed something more unseemly, I noticed a definite pattern as to how payment was requested at the bank. It became clear to me, our checks made payable to Mr. Robert Downey were not always properly endorsed by his business (as shown below) but, were in fact, actually signed by Robert Downey himself or others and submitted to a bank teller for payment in cash money beginning as early as 1999.

**PAY TO THE ORDER OF
SUNTRUST BANK, MIAMI
FOR DEPOSIT ONLY
ROBERT M. DOWNEY, P.A.
0189001159635**

13. Moreover, we submit, if, our check(s) made payable to Mr. Robert Downey equaled or exceeded One Thousand ($1000.00) dollars the check was deposited into his business account as shown in Exhibit A, however, if the check(s) made payable to Mr. Robert Downey amounted to less than One Thousand ($1000.00) dollars as shown in Exhibit B, the check was cashed for money. We noticed this trend continue unabated over many years. Copies of two such canceled checks are attached hereto as Exhibit "A" (≥ $1000.) and Exhibit "B" (<$1000.)

14. As our attorney-client relationship evolved with Mr. Downey, we also partnered with Mr. Craig, a person Mr. Downey recommended, a person we believed worked with or for Downey making patent drawings.

15. Once we partnered with Mr. Craig, Mr. Downey seemed to treat me and my wife in a friendlier more relaxed manner, or, it may have just seemed that way. Anyway, at some point Mr. Downey started to offer me the opportunity to pay a little less money when I'd pay in cash. So I did.

16. I began paying Downey with some cash but I also paid him with United States Postal Money Orders. Recently I paid a fee to the U. S. Postal Service to track said money orders that I mailed to Mr. Downey to confirm the money orders were timely cashed by the recipient. I received affirmative confirmation.

17. For the record; I have in my possession the original receipts showing the date, time, and Post Office branch, the amount of the U. S. Postal Money Orders and my method of payment. *See* Exhibit "C" attached hereto.

18. For the record; I am also in possession of all of the original detached stubs of the United States Postal Money Orders. *See* Exhibit "D" attached hereto.

19. For the record; I have in my possession photocopies of the original U. S. Postal Money Orders addressed to Mr. Downey at his 2002 office located at 150 East Palmetto Park Road, Suite 350, Boca Raton, Florida. Copies of two of the U. S. Postal Money Orders are attached hereto as both Exhibit "E" ($500.), and, Exhibit "F" ($500.)

20. The U. S. Post Office receipt attached hereto as Exhibit "C" shows the purchase date; is after Downey's invoice of March 11, 2002, and includes the following:
    - Location of purchase: **Sunset Branch - Miami, Florida**
    - Date of purchase: **April 01, 2002**

- Time of purchase: **10:06:37 AM**

- Total purchase amount: **$1,005.30**

- Description #1: **$500. Domestic Money Order**

- Description #2: **$500. Domestic Money Order**

- Description #3: **$3.50. Stamp**

- Paid by: **Cash**

21. As for Mr. Downey's sworn statement, <u>See</u> Declaration of Robert M. Downey at Paragraph (4) that states as follow:

> [A]t the time of issuance of the patent, the Plaintiffs and James J. Craig had accrued approximately $4,200.00 for legal fees and expenses, which had not been paid, despite my written demand for payment. <u>See</u> Exhibit A. Contrary to the allegations in paragraphs 58 and 65 of Plaintiff's Complaint, I was not timely paid for my legal fees and expenses. <u>See</u> Exhibit A. To the best of my knowledge, this past due balance of approximately $4,200.00 owed by Plaintiff's and James J. Craig <u>has still not been paid</u>.

Mr. Downey is not believable. This statement cited directly above is obviously false and misleading, when looking at just this one lone example. My receipt, the money order stubs, and the copies of the original U. S. Postal Money Orders themselves, tell a whole different story than that of Mr. Downey. There is no doubt I made this purchase. I have the original receipt. The purchase date on

the receipt clearly shows **April 01, 2002** which falls <u>after</u> March 11, 2002 and the U. S. Postal Money Orders were correctly addressed and redeemed.

22. On or about April 01, 2002, I intended pay Downey the One Thousand dollars ($1000.00) in cash, but, I could not drive to Boca Raton, so I made that purchase to mail the cash payment to Downey's office. My receipt shows the Post Office branch was just down the street from my residence in 2002. The receipt even shows I purchased stamps too. After, I made the purchase I went home, filed out the money orders, copied them, and then mailed the payment to Downey. My copies of these money orders show Mr. Downey's correct business address in 2002. Records show those money orders were cashed by an individual identifying himself as Robert M. Downey.

23. The fact is Mr. Downey's declaration statement above certainly <u>cannot</u> be true!

24. Based on Mr. Downey's sworn statements, he would have this Court believe that neither my $1000.00 payment shown here nor any other payments made by me after March 11, 2002 were received by Defendants. Such a scenario is just too unbelievable based on my evidence. To that end, I submit, when you include what my check cashing evidence shows about Mr. Downey's unethical business practices, it is way more likely than not, that Robert M. Downey, President of Robert M. Downey, P.A., cashed the money orders and pocketed the cash instead of depositing the payment into Robert M. Downey, P.A.'s business account, resulting in the corruption of his business's bookkeeping.

25. I do recall, on a one occasion I did ask Mr. Downey why my bill did not reflect some of my payments. His response was, "don't worry" it was only a clerical error by my secretary. After that I never again gave it much thought.

26. With respect to the same paragraph referenced above, where the Defendants allege in part the attorney-client relationship was terminated;

> **[W]hen the patent issued in 2002, i.e., the point at which the parties' relationship terminated,**

This statement is most certainly contrived in lieu of litigation. How so? Because looking at Defendants declaration (*See* Exhibit B), Downey is doing business with his clients as usual, the letter's language, content, and demeanor of the author are unremarkable. No angst, no mention of a past balance due and owing. This letter is certainly representative of an attorney-client relationship which is operationally intact.

27. I submit; when the lock patent granted the attorney-client relation <u>did not</u> terminate as Downey alleges, but continues even as I attest to this declaration. Neither my co-inventors nor I terminated the attorney-client relationship with Mr. Downey or his business Robert M. Downey, P.A.

28. I hereby, submit Exhibit "G" into evidence as proof contrary to Mr. Downey's statement cited in ¶ No. 26. Exhibit "G" shows a letter from Mr. Downey dated September 19, 2002 sent to co-inventor Mr. Craig, Ziomara, and myself. The letter shows Downey <u>did</u> in fact; act as our attorney, when we paid him to construct his written legal opinion, on the possible infringement of our patent

by a new product, trademarked at such time by the name of LAZER LOCK. Downey ultimately billed <u>his clients</u> for the legal opinion he provided. There is no denial plausible here. Enough said. <u>See</u> Exhibit "G" attached hereto.

29. I further submit Downey made no mention of any balance due and owning his law firm on said lock patent when Downey sent me his invoice to pay for the infringement opinion.

30. I submit the final statement of the **September 19, 2002** letter is a true reflection of Downey's demeanor at such time. First, there is no mention of a debt owed whatsoever by these Plaintiffs' or Mr. Craig in this letter. Second, there is no doubt Downey appears to be more than glad to provide his legal opinion and services to <u>his clients</u>, clients which are apparently in good financial standing with Mr. Downey's law firm.

> **[I] will be glad to address any questions that you may have regarding this matter, and I will discuss these issues in more detail when we meet this week.**
>
> **Kindest regards,**
>
>       **Very truly yours,**
>
>       **ROBERT M. DOWNEY, P.A.**

31. I know Downey's declaration in support of his motion to dismiss or transfer is awash with lies and misrepresentations. It is absolutely incredulous, that he could actually expect any reasonably intelligent person to believe he was

sincere and his motivation true in his statement under FACTS at the first unnumbered paragraph which begins as follows:

> [I]n February 2005, as a <u>courtesy</u>, Defendants' sent Plaintiffs' notice that the 3.5 year maintenance fees were coming due on July 8 of that year.

A <u>courtesy</u> not very likely; Downey billed me incessantly for anything and everything imaginable.

32. I submit; if money was owed him, as he now claims, knowing Mr. Downey as only a client could, no such gesture would have been forthcoming. Downey needs to somehow couch sending the letter of February 2005 as gesture on his part, a courtesy because the act of sending such a letter flies in the face of his debtor claim. And, any such act on his part sends a loud and clear message that the attorney-client relationship was intact and must be countered.

33. I know the document Downey's declaration at paragraph (8) references is a fraud (<u>See</u> Declaration of Robert M. Downey Exhibit C). I have never seen this document before. The document dated July 19, 2005 is not authentic.

34. I submit; these Defendants, as lawyers, are aware if they cannot show, which they cannot, that the attorney-client relationship was at some point terminated prior to the lock patent's 7 ½ maintenance fee notice they will be found in breach of contract, negligent and responsible for the damages Plaintiffs' suffer. So these Defendants, had to fabricate and introduce a wily subterfuge, a ruse, into the record. The letter of July 19, 2002 is one such ruse, offered up as

Downey's means to an end, the coup de grâce, Defendants deathblow to Plaintiffs' claims. Defendants motion at the second unnumbered paragraph Defendants write:

> **[D]efendants sent another letter to Plaintiffs dated July 19, 2005, to the forwarding address, again confirming the termination of the relationship,**

I contend Downey's introduction of this contrived document, he introduced into the record as evidence in support of his sworn statements is outright fraud, (*See* Declaration of Robert M. Downey Exhibit C).

35. Defendants uncertified faked representation of a final termination between Plaintiffs and Defendants raises numerous valid and poignant questions, why, would Defendants fail to send it certified, why, would Defendants fail to remove themselves as the attorney-of-record with the United States Patent and Trademark Office (USPTO) on or about July 19th 2005, if in fact, Defendants did actually send such a letter, which they did not, why, did Mr. James Craig fail to receive such a letter, Craig's address has not change in all the time we have known him and remains the same to this day, that being said, I submit the document is a fake.

36. Surely, the standard protocol taught in every law-school dictates the proper method of terminating the attorney-client relationship in and outside a court of law. Downey is a practicing lawyer in Florida. Downey knows or should have known clients must be timely noticed. Termination Notice's in all facets of

BLACKMOON v DOWNEY
CASE NO. 13CV1206 SMV-RHS

business must be acknowledged and recorded. In this instance Notice must be timely sent to the effected client by US Postal Mail Certified Return Receipt Requested and Notice be given to the United States Patent & Trademark Office (USPTO). Downey offers no such proof he did either.

37. I submit; the document of July 19th 2005 cannot be authenticated.

38. I submit: the sum and substance of said faked document is so acutely crafted and tailored to fit this matter the document reeks of fraud.

39. I demand irrefutable proof, from Downey showing Ziomara and I, and Craig owe Downey $4,194.95. Because, outside his invoice, the evidence points to Downey lying about the debt.

40. Just because Mr. Downey says it's so, doesn't make it so.

Pursuant to 28 U.S.C. §1746, I hereby declare under penalty of perjury that the forgoing statements made by me are true and correct to the best of my knowledge.

*Frank Blackmoon*

State of New Mexico
County of Cibola

The foregoing instrument was acknowledged before me this _17_ day of March, 2014 by Frank Blackmoon [X] who is personally known to me.

*Bob Clements*
Notary Public
Commission Stamp/Seal:

May 28, 2015

Notary Seal

- 11 -





PITNEY BOWES
$ 005.60⁰
02 1P
0001919534 MAR 24 2014
MAILED FROM ZIP CODE 87321

UNITED STATES POSTAL SERVICE
Visit us at usps.com
Label 106A, May 2008

USPS TRACKING #
9114 9011 5981 8789 6756 3

PRIORITY MAIL
UNITED STATES POSTAL SERVICE
Visit us at usps.com
Label 106A, May 2008

RECEIVED
At Albuquerque NM
MAR 25 2014
MATTHEW J. DYKMAN
CLERK

PRIORITY MAIL
For Domestic and International Use
UNITED STATES POSTAL SERVICE

From: Frank Blackmoon
HC. 61 Box 301
Ramah NM 87321

TO: Court
333 Lomas Blvd
Suite 270
Albuquerque NM 87102

Label 228, January 2008

Flat Rate Mailing Envelope
Visit us at usps.com

INTERNATIONAL RESTRICTIONS APPLY:
Customs forms are required. Consult the International Mail Manual (IMM) at pe.usps.gov or ask a retail associate for details.

PS00001000014